IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JEROME M. MERAZ                                                                                           PLAINTIFF

                    v.                  Civil No. 5:23-cv-05044-TLB-MEF

SHERIFF JAY CANTRELL,
Washington County, Arkansas;
CAPTAIN NOLAN AKE,
Washington County Detention Center (WCDC);
CORPORAL TOM MULVANEY, MCDC;
CORPORAL CORLEY, WCDC;
JAILER CAMERON STOUT, WCDC;
CORPORAL DOMINICK NUNZIATO, WCDC;
CORPORAL BENJAMIN VELASCO, WCDC;
CORPORAL CHRISTOPHER DRUMWRIGHT, WCDC;
SERGEANT RANDELL FULLER, WCDC; and
PAIGE BLOCK, Dietician                                                                                DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Jerome M. Meraz ("Meraz"), filed this *pro se* civil rights action under 42 U.S.C. § 1983. Meraz proceeds *pro se* and *in forma pauperis* ("IFP"). The claims at issue in this case arose while Meraz was incarcerated in the Washington County Detention Center ("WCDC"). While housed at the WCDC, Meraz contends Defendants violated his federal constitutional rights by denying him access to the courts, improperly classifying him as a sex offender, failing to allow him to groom in the way he desired, by providing an inadequate diet, and by failing to properly follow COVID-19 protocols. Meraz has sued the Defendants in both their individual and official capacities.

1

Pursuant to the provisions of 28 U.S.C. §§ 636(b)(1) and (3), the Honorable Timothy L. Brooks, United States District Judge, referred this case to the undersigned for the purpose of making this Report and Recommendation on the Motion for Partial Summary Judgment on the issue of exhaustion (ECF Nos. 46-48) filed by the Defendants Cantrell, Ake, Mulvaney, Corley, Stout, Nunziato, Velasco, Drumwright, Fuller. Meraz has responded. (ECF Nos. 52, 54). The Motion is ready for decision.

## I.     BACKGROUND

In his Amended Complaint, Meraz indicates the time frame at issue began on February 14, 2022, and went through April 30, 2023. (ECF No. 10 at 3). According to his booking records, Meraz was booked into the WCDC on April 2, 2022, and remained incarcerated there until his release on July 1, 2022. (ECF No. 48-2 at 2).[1] His pending criminal charges included harassment, stalking, and violation of a protective order. *Id.* Meraz was next incarcerated at the WCDC from August 13, 2022, through March 30, 2023. *Id.* at 7. His criminal charges included stalking and violation of a protection order. *Id.* Meraz again became incarcerated at the WCDC on May 12, 2023, and was released on May 26, 2023. *Id.* at 9. His pending criminal charge was stalking. *Id.* Meraz is currently incarcerated in the Delta Regional Unit of the Arkansas Division of Correction.

Meraz asserts five separate claims in his Amended Complaint. (ECF No. 10). In Claim One, Meraz alleges he was denied access to the courts. *Id.* at 3. Specifically, he states he was

---

1 To ensure ease in locating record citations, all references to the summary judgment record are to the CM/ECF document and page number rather than to exhibit designations used by the parties.

granted permission on February 28, 2023, to represent himself by Judge Taylor—presumably on his pending criminal charges. *Id.* On March 8, 2023, Meraz alleges his personal assistant, his mother, Charlene Meraz, dropped off a large envelope of exhibits, paper, and envelopes along with court orders. *Id.*

Meraz says the guards refuse to sharpen pencils which are the only writing implements inmates have available. (ECF No. 10 at 4). One guard went so far as to try to give Meraz another inmate's pencil. *Id.* Meraz indicates he refused to accept it. *Id.*

In some of his legal mail, Meraz says there was a plastic envelope approximately 12 x 15 ½ inches. (ECF No. 10 at 4). Meraz placed ten subpoenas, ten issued subpoenas, three motions, and the order granting the motions inside the plastic envelope. *Id.* Officer Martinez provided him with a flex pen to address the envelope. *Id.* Meraz attempted to give the envelope to Defendant Stout, but he refused saying the envelope was too large. *Id.* at 4-5. After Meraz explained what it was, Defendant Stout allegedly told him to have the night shift pick it up. *Id.* at 5. An hour later, Defendant Corley refused to take the envelope because it was an unrecognized envelope and there was no postage on it. *Id.* Meraz explained what was in the envelope and that the "mark of frank" was the postage.[2] *Id.* The following morning, Officer Martinez provided Meraz with a sharpie to make the address more legible and accepted the envelope. *Id.*

---

[2] According to the United States Postal Service, "[f]ranked mail is defined as Official Mail sent without postage prepayment, which can be used only by members and members-elect of Congress, the Vice President, and other authorized individuals." https://about.usps.com/postal-bulletin/2021/pb22576/html/info_002.htm (last accessed Feb. 14, 2024).

Four days later, Meraz was asked "on the speaker" if he was trying to mail an envelope to his mother. (ECF No. 10 at 5). Meraz replied that he was but did not know who he was speaking to. *Id.* A short time later, Officer May ordered Meraz to open the envelope and confiscated it. *Id.* at 6. Meraz says the envelope had been placed in his property. *Id.* Meraz was advised that writing "legal mail" on something did not make it so. *Id.* Instead, legal mail was mail to or from an attorney or the court. *Id.* Meraz disagrees with this definition stating it is what is inside the document that makes it legal mail. *Id.* Meraz ended up dividing a portion of the pages between three stamped envelopes and asked an attorney to walk the envelopes a block and a half to his office and then "file them." *Id.* Although the attorney agreed, the documents were never filed and cannot be located. *Id.* As of April 26, 2023, when he filed his Amended Complaint, Meraz indicates he had not been able to "rewrite all of those." *Id.* at 7. This task was complicated by his transfer to the ADC. *Id.* Furthermore, Meraz says the motions, subpoenas, and questionnaires he had in the large envelope would have taken at least nine envelopes and he is only given two a week by the WCDC. *Id.*

Meraz indicates he asked the Circuit Court for access to the law library, but the prosecuting attorney objected on the grounds the WCDC had a law library on the kiosk. (ECF No. 10 at 7). Meraz points out that each pod only has one kiosk, and it is mounted approximately three feet off the floor with no table or place to write. *Id.* Meraz states there are on average 30 inmates in the barracks. *Id.* Each inmate is supposed to get approximately 30 minutes at the kiosk, of which 15 minutes is taken up with visits, ordering commissary, etc. *Id.* Meraz states the "math & access don[']t add up." *Id.*

Meraz indicates Defendant Mulvaney is over "legal matters" at the WCDC and is making everything difficult. (ECF No. 10 at 8). Meraz maintains he is not being supplied with the materials he needs to represent himself. *Id.* Meraz indicates he gets one "golf pencil," no eraser, no sharpener, eight sheets of paper, and two stamped envelopes a week. *Id.* When Meraz requests additional paper, he is told it is only passed out on Sundays. *Id.* When he asks for his pencil to be sharpened, the response is they do not have time. *Id.*

In Claim Two, Meraz contends Defendant Cantrell has in place a policy that "if you've ever been accused of a crime that would make you have to register you are to be housed in the sex offender pod & not allowed to be a trustee." (ECF No. 10 at 9). On or about August 17, 2022, Meraz says he advised Defendant Corley that he was in the wrong pod and needed to be reclassified. *Id.* Meraz pointed out he had never been convicted of a "sex crime" and his current charges, if he was convicted, would not submit him to registration as a sex offender. *Id.*

On February 11, 2023, during a jail check, Defendant Drumwright told Meraz that since he had been in the sex offender pod for so long and all the trustees had seen him there it would not be safe to release him into general population. (ECF No. 10 at 10). On February 12, 2023, Meraz was advised by Defendant Velasco that the information he had access to indicated Meraz had been convicted of rape. *Id.* at 9-10. The following day, Defendant Fuller made a similar statement and declined to move Meraz. *Id.* at 10. On February 14, 2023, Defendant Nunziato stated his information showed Meraz had been found guilty of rape in 2008. *Id.* Defendant Drumwright echoed these statements. *Id.*

5

Meraz indicates he paid for a copy of his 2008 commitment papers and mailed them to Captain Ake. (ECF No. 10 at 10). On February 23, 2023, the papers were returned and Meraz advised he would not be moved. *Id.*

In Claim Three, Meraz contends the WCDC grooming policies are demoralizing, dehumanizing, adversely affects his self-esteem and mental well-being, and violates his religious beliefs. (ECF No. 10 at 11-12). Meraz states it he is Native American, and it is their religious belief that they should be allowed to wear their hair and facial hair "to suit ourself, what ever mentally makes us feel good." *Id.* at 11. At the WCDC, Meraz said haircuts and shaves are all considered to be a courtesy. *Id.* at 12. The only mandatory shaves occur when an inmate is going to an in-person court proceeding. *Id.* Zoom hearings do not require mandatory shaves. *Id.* Furthermore, if a person is allowed a haircut or shave it is an "all or nothing" policy—take it all off or nothing. *Id.*

In Claim Four, Meraz alleges that the diet provided is nutritionally inadequate. (ECF No. 10 at 13). He indicates he came into the WCDC weighing 205 pounds and when he left, he was down to 165. *Id.* Meraz states the food was under cooked "a lot of times, smelt & or tasted rotten & not replaced." *Id.* When he complained to the kitchen, the responses he received were: "shut your face, your momma, mind your own business," the meals were in compliance in respect to the quantity given, contained 3,000 calories per day, and they could have him weighed at a charge of $10 per sick call. *Id.*

Finally, in Claim Five, Meraz contends that between February 28, 2023, and March 20, 2023, all the jailers at the WCDC engaged in "germ war fair." (ECF No. 10 at 14). On February

28, 2023, Meraz indicates an inmate who tested positive for COVID-19, was removed from the barracks, and the barracks was put on exposed quarantine status and exposed status protocols were applied.  *Id.*  Any officer or staff member who encountered an exposed inmate was to be masked up for the inmate's and the rest of the jail's protection.  *Id.*   From February 28 to March 5, Meraz indicates everyone did well.   From March 5 until March 20, Meraz says basically no one followed protocol and as a result the jail had an outbreak.  *Id.*   Meraz indicates there were several inmates pulled from the barracks at various times causing the barracks to remain on exposed status.  *Id.*  According to Meraz, inmates would not ask to be tested.  *Id.*  The WCDC would only test when an inmate requested or every five days after an inmate had tested positive.  *Id.*

## II.     APPLICABLE STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."  *Nat. Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor."  *Nat.l Bank*, 165 F.3d at 607 (citing *Anderson v.*

*Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.  DISCUSSION

Defendants have moved for partial summary judgment on the issue of exhaustion. Defendants argue Meraz: (1) failed to exhaust his administrative remedies as to all individual capacity claims against Defendants Cantrell and Ake; (2) failed to exhaust his wrongful classification claims against Defendant Corley; (3) filed no grievances as to Claim Four—adequate nutrition; (4) failed to list any of the Defendants as being those involved in Claim Five—COVID-19 protocols.

As to the claims remaining, Defendants Mulvaney, Corely, Nunziato, Velasco, Drumwright, and Fuller indicate they do not intend to rely on the exhaustion defense. (ECF No. 50 at 1). However, they join in the request for Claims Four and Five to be dismissed. *Id.*

#### A.  The Exhaustion Requirement

The Prison Litigation Reform Act ("PLRA") in 42 U.S.C. § 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Exhaustion is mandatory. *Porter v.*

*Nussle*, 534 U.S. 516, 524-25 (2002). In *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court concluded "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules." *Id*. at 218 (internal quotation marks and citation omitted). The Court stated that the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id*. A prisoner's remedies are exhausted "when [the] inmate pursues the prison grievance process to its final stage and receives an adverse decision on the merits." *Hammett v. Cofield*, 681 F.3d 945, 947 (8th Cir. 2012).

### B. The WCDC Grievance Procedure

The WCDC has an inmate grievance procedure. (ECF No. 48-4 at 1-2). Inmates are advised that grievances may be filed "whenever the detainee believes they have been subjected to abuse, harassment, an abridgment of civil rights, or a denial of privileges specified in the Detainee Handbook." *Id.* at 1. Grievances are to be made within 10 days of the alleged incident "unless there is good cause for a reasonable delay.[3]" *Id.* at 2. Grievances filed more than 30 days after an alleged incident will not be considered. *Id.* Grievances are to be submitted via the kiosk located in the cell block. *Id.* The grievance "shall state fully the time, date, location and names

---

[3] When initially describing the grievance procedure in their brief, Defendants state grievances must be submitted within eight hours from the event complained of. (ECF No. 47 at 5). The Court assumes this is merely an error because the grievance procedure clearly provides for a period of 10 days.

9

of those detention officers and/or staff member's involved and pertinent details of the incident, including the names of any witnesses and how the incident personally affected the detainee." *Id.*

The supervisor must notify the jail administrator or his designee "[i]f the grievance constitutes a prohibited act by an officer or staff member, a criminal act, or a violation of the detainee's civil rights." (ECF No. 48-4 at 2). The duty supervisor is to provide "a timely response following the investigation of the grievance, to include findings and actions taken." *Id.* A detainee may appeal the response within five days, "by indicating his or her desire for further review of the response on the kiosk provided in the cell block." *Id.* However, no appeal will be considered on, among other things, medical decisions, treatment, or testing, dietary concerns, or disciplinary matters.[4] *Id.*

Although in less detail, the grievance procedure is also outlined in the Detainee Handbook. (ECF No. 48-5 at 1). Detainees are advised that they are allowed to file a grievance if they have been "subjected to abuse or an abridgement of [their] civil rights while being detained." *Id.* at 1. Grievances are to be made on the kiosk, submitted within 10 days, and must include: the date and approximate time of the event; the names of the persons involved; the names of any witnesses; and the pertinent details of the event. *Id.* The Handbook states: "All grievances are reviewed by the Jail Administrator or their designee. If you feel your grievance was improperly handled, you may appeal to the Sergeant or Lieutenant." *Id.* at 2. Although not at issue here, it is noteworthy that

---

4 Meraz points out that the grievance policy itself is not available to inmates. (ECF No. 52 at 4). Instead, the inmates only have access to the summary version contained in the Handbook. *Id.*

the Detainee Handbook does not mention that an appeal must be made within five days after receipt of the response. *Id.*

### C. Claims Against Defendants Cantrell and Ake

The Court agrees with Defendants Cantrell and Ake that Meraz failed to name them in any of his grievances. In opposition, Meraz argues that no one would mention Defendant Cantrell's name and he only learned of it through the news. (ECF No. 52 at 1). While this may be true, Meraz did not refer to Defendant Cantrell by his title either, although doubtless he knew the sheriff had overall supervision over the facility. Instead, Meraz merely argues that Defendants Cantrell and Ake make and enforce the rules and policy at the WCDC. *Id.* He maintains "[t]hey should not be above the law when it comes to human rights violations." *Id.* Finally, Meraz argues Defendant Cantrell is named "by proxy" whenever Meraz files a "grievance on any officer that is [e]nforcing his rule." *Id.* at 3. Meraz presents a nearly identical argument with respect to Defendant Ake. *Id.* at 4.

The Court notes that Meraz has sued all Defendants in both their individual and official capacities. Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated against a defendant in both his individual and his official capacities. The type of conduct that is actionable and the type of defense available depend on whether the claim is asserted against a defendant in his official or individual capacity. *See Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (internal citations omitted). "Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the

11

only type of immunity available is one belonging to the entity itself." *Id.* In other words, Meraz's official capacities claims against the Defendants are claims against Washington County, Arkansas. If Meraz proves the existence of an official capacity claim, Washington County will be liable even though Defendants Cantrell and Ake are no longer parties to this lawsuit.

Because Meraz failed to name Defendants Cantrell and Ake[5] in his grievances, he failed to comply with the grievance policy.[6] Defendants Cantrell and Ake are entitled to summary judgment on the claims against them.

### D. Claim Three—Wrongful Classification Claims Against Defendant Corley

Defendant Corley argues he was not named in any of Meraz's grievances related to his being classified as a sex offender. Meraz does not respond to this assertion and points to no grievance naming Defendant Corley.

Although Meraz submitted numerous complaints regarding his being classified as a sex offender, none of the grievances mention Defendant Corley, nor does it appear Defendant Corley responded to any of grievances regarding this topic. (ECF No. 48-3 at 2-5, 20-21, 26; ECF No. 54 at 43-44, 46, 67-69). For this reason, Meraz failed to exhaust his administrative remedies with respect to Defendant Corley on Claim Three.

---

5 The only mention of Defendant Ake appears in Meraz's response to a statement made by Defendant Mulvaney that he would investigate why Meraz was in the sex offender pod. Meraz says: "[I]'ve gone as far up the chain as cpt. AKA so [I] don['] think a cpl. would be able to correct it but be my guest."

6 Although the policy requires a grievance to be submitted, Defendants have analyzed both grievances and requests as related to Defendants Cantrell and Ake. (ECF No. 47 at 5). However, by doing so, they state they "do not waive the explicit policy requirements of a grievance in other matters." *Id.*

### E. Claim Four—Inadequate Diet

Defendants contend Meraz filed no grievances related to the nutritional value of the meals until after he had filed this case. Review of the grievances indicates that on December 9, 2022, and December 10, 2022, Meraz submitted grievances complaining that the rice had not been fully cooked for the evening meal and was crunchy. (ECF No. 48-3 at 16-17).

In opposition, Meraz submitted several "affidavits" of fellow inmates indicating they constantly complained about the food not being cooked all the way, rotten pieces of vegetables, and the beans being sour tasting or smelling; however, the "affidavits" are not notarized or sworn to under penalty of perjury, and they cannot be considered by the Court. Further, they do not address the pertinent question: Did Meraz exhaust his administrative remedies on his inadequate diet claim?

Meraz filed this case on March 23, 2023. He filed his Amended Complaint on April 26, 2023. (ECF No. 10). The Amended Complaint contained the inadequate nutrition claim. The first grievance submitted by Meraz addressing the inadequate nutrition claim was submitted on May 25, 2023—more than two months after he filed this case.

While his earlier grievances may not have mentioned the quantity of food, Meraz argues they clearly called into question the quality of the main course. Meraz argues that "if the quality is not there than the quantity is not there either." (ECF Nos. 52, 54). He maintains his December 9 and 10 grievances suffice to exhaust his inadequate nutrition claim. *Id.* The Court disagrees. The two December grievances only address the rice being undercooked on two consecutive days.

They make no reference to the quantity of food, the lack of nutritional value, or Meraz's weight loss. Defendants are entitled to dismissal of this claim based on Meraz's failure to exhaust.

### F. Claim Five—COVID-19 Protocols

Defendants maintain they are entitled to dismissal of this claim on the grounds that Meraz named none of them in his claim related to COVID-19 protocols/mask wearing in the jail. On March 15, 2023, Meraz submitted a grievance complaining that the barracks was on exposed status and inmates were constantly exposed to other inmates and to jail staff who were not wearing masks. (ECF No. 48-3 at 30). He did not identify any staff member by name. *Id.* Meraz also submitted several requests/grievances to medical services about testing and the length of time the barracks was on "exposed status." *Id.* at 38, 40, 41.

In opposition, Meraz asks the Court to leave all named Defendants and to add the entire facility staff working between February 28, 2023, and March 25, 2023, excluding Defendant Drumwright, as defendants on Claim Five. (ECF No. 52 at 2, 4-5). As to Defendant Drumwright, Meraz indicates he was the only officer Meraz can name who wore a mask. *Id.* at 1. Meraz does not, however, point to any grievance naming a single member of the staff.

The WCDC grievance policy clearly requires the naming of the persons involved. (ECF No. 48-5 at 1). Meraz does not deny he had access to the detainee handbook which set forth the requirements of the grievance procedure. Clearly, Meraz knew how to operate the kiosk and submit grievances. Defendants are entitled to summary judgment on this claim because Meraz failed to comply with the terms of the grievance policy and, therefore, failed to exhaust his administrative remedies.

## IV.     CONCLUSON

For the reasons and upon the authorities discussed above, it is RECOMMENDED that the Defendants' Partial Motion for Summary Judgment (ECF No. 46) be **GRANTED**, and the following claims be **DISMISSED WITHOUT PREJUDICE** based on Plaintiff's failure to exhaust his administrative remedies:

- All personal capacity claims against Defendants Cantrell and Ake. As Meraz has asserted official capacity claims against all Defendants, the official capacity claims against Defendants Cantrell and Ake are duplicative. They may, therefore, be terminated as Defendants.

- The wrongful classification claims against Defendant Corley.

- Claim Four asserting inadequate nutrition. This results in the dismissal of all claims against Paige Block and Janet Haney.[7] They may, therefore, be terminated as Defendants.

- Claim Five asserting failure to adhere to COVID-19 protocols.

**Status of the Referral:** This case should remain referred for all matters not recommended for dismissal in this Report and Recommendation.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file**

---

[7] Defendants Block and Haney did not file their own motion for summary judgment on the issue of exhaustion; however, dismissal of the inadequate nutrition claims results in the dismissal of all claims against Defendant Block, the dietician, and Defendant Haney, the kitchen supervisor.

**timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 20th day of February 2024.

/s/ *Mark E. Ford*
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE