IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JEROME M. MERAZ                                                                  PLAINTIFF

v.                              Civil No. 5:23-cv-05044-TLB-MEF

CORPORAL TOM MULVANEY,
Washington County Detention Center (WCDC);
CORPORAL CORLEY, WCDC;
JAILER CAMERON STOUT, WCDC;
CORPORAL DOMINICK NUNZIATO, WCDC;
CORPORAL BENJAMIN VELASCO, WCDC;
CORPORAL CHRISTOPHER DRUMWRIGHT, WCDC;
and SERGEANT RANDELL FULLER                                      DEFENDANTS


**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiff, Jerome M. Meraz ("Meraz"), filed this civil rights action under 42 U.S.C. § 1983. Meraz proceeds *pro se* and *in forma pauperis*.   The claims at issue in this case arose while Meraz was incarcerated in the Washington County Detention Center ("WCDC") in Fayetteville, Arkansas.   While housed at the WCDC, Meraz contends Defendants violated his federal constitutional rights by denying him access to the courts, improperly classifying him as a sex offender, and failing to allow him to groom in the way manner he desired.   Meraz has sued the Defendants in both their individual and official capacities.

Pursuant to the provisions of 28 U.S.C. §§ 636(b)(1) and (3), the Honorable Timothy L. Brooks, United States District Judge, referred this case to the undersigned for the purpose of

making this Report and Recommendation on the Motion for Summary Judgment filed by the Defendants. (ECF Nos. 91-93). Meraz has responded. (ECF Nos. 99, 100, 101). The Motion is ready for decision.

## I.    BACKGROUND

In his Amended Complaint, Meraz indicates the time frame at issue began on February 14, 2022, and went through April 30, 2023. (ECF No. 10 at 3). According to his booking records, Meraz was booked into the WCDC on April 2, 2022, and he remained incarcerated there until his release on July 1, 2022. (ECF No. 93-2 at 1-2). His pending criminal charges at the time included harassment, stalking, and violation of a protective order. *Id.* Meraz was next incarcerated at the WCDC from August 13, 2022, through March 30, 2023. *Id.* at 3-4. His criminal charges during that incarceration included stalking and violation of a protection order. *Id.* at 2. In connection with Defendants' earlier Partial Motion for Summary Judgment on exhaustion, Defendants submitted a third set of booking records, and those records indicate Meraz again became incarcerated at the WCDC on May 12, 2023, and was released on May 26, 2023. (ECF No. 48-2 at 9). His pending criminal charge at that time was stalking. *Id.* Meraz is currently incarcerated in the Delta Regional Unit of the Arkansas Division of Correction ("ADC").

In a prior ruling on a summary judgment motion on the issue of exhaustion, the Court dismissed several claims and Defendants. This left for later consideration the following claims: (1) denial of access to the courts; (2) improper classification and housing as a sex offender; and (3) denial of the right to groom in the manner he desired. (ECF Nos. 61, 62).

2

### A.    The Record Regarding the Access to the Courts Claim

According to the affidavit of Defendant Mulvaney, the WCDC's policy is that all inmates "shall have reasonable access to the courts through counsel whether appointed or retained, and in the event counsel has not been retained or appointed, the inmate should have reasonable access to law library materials."  (ECF No 93-1 at 3).   Inmates have access to a legal library via kiosks in the housing areas and may obtain legal materials through their attorney or public defender.  *Id.* "If an inmate is representing themselves in the court system, the detainee must obtain a court order to be taken to the law library.   The detainee may request specific legal material from the court through the mail."  *Id.*

With respect to legal materials, the detainee handbook provides as follows:

> You may obtain legal material through your attorney or public defender.   If a detainee is representing them self in the court system, the detainee must obtain a court order to be taken to the law library. The Detainee may request specific legal material from the court through the mail.

(ECF No. 93-5 at 1).

Letters to or from inmates, "shall be opened and inspected for contraband but may not be censored.   Letters may be read if there is reasonable suspicion that there is a threat to order or security, or that the letter or package is being used to further illegal activity."  (ECF No. 93-1 at 4).   Inmates are to be notified if a letter or package is rejected for delivery "unless notification would infringe on security or law enforcement activity."  *Id.*

Indigent inmates are provided two first class stamps per week.  (ECF No. 93-1 at 4; *see also* ECF No. 93-4 at 14, WCDC Detainee Communication Policy).   Defendant Mulvaney

3

indicates this is sufficient postage to mail two standard-sized, rectangular envelopes per week. (ECF No. 93-1 at 4). Indigent inmates also receive stationery "sufficient to send at least two letters of general correspondence per week." *Id.* at 5.

Defendant Mulvaney indicates the chief executive has established a written policy which provides that an inmate may "send sealed letters to courts, officials of the confining authority, counsel, government officials, administrators of grievance organizations and parole or probation authorities." (ECF No. 93-1 at 4; *see also* ECF No. 93-4 at 14, definition of privileged correspondence). Outgoing privileged mail to any of the above shall not be opened or inspected, "unless reasonable suspicion exists that the letter poses a threat to the security and order of the facility or a threat to a recipient." (ECF No. 93-1 at 4). Defendant Mulvaney says that outgoing privileged mail "initiated by any indigent detainee shall be mailed without charge to the detainee." *Id.* at 4-5; *see also* ECF No. 93-4 at 14. This covers only first-class postage and not registered, certified, or insured mail. *Id.* Further, Defendant Mulvaney says the Sheriff's Office "does not pay for indigent inmates to mail large envelopes or any mail weighing more than one ounce." (ECF No. 93-1 at 5). The policy provides that "[i]ndigent detainees shall receive postage and stationary sufficient to send at least two letters of general correspondence per week." (ECF No. 93-4 at 15). Packages are returned to the sender unopened. (ECF No. 93-4 at 16). Mail is collected from the detainees once each day during the hours of 8:00 a.m. to 5:00 p.m. *Id.*

4

With respect to telephone calls, the policy[1] provides that each detainee shall have "equal and adequate access to a telephone to maintain community ties and contacts with attorneys." (ECF No. 93-4 at 16).   Detainees are allowed a reasonable number of calls at book in.   *Id.*   Only collect calls may be made from the cell blocks and the length of each call is limited to 15 minutes. *Id.*

In his deposition, Meraz testified that the primary focus of his denial of access to the courts claim was after February of 2022, when he was allowed to represent himself in his criminal case. (ECF No. 93-6 at 24-25).   Meraz believed the basis of his claim was outlined in his grievances. *Id.* at 25.   Meraz testified about several incidents.   He indicated there was a video of an officer, whose name Meraz could not recall, removing his documents from a "large white plastic envelope that [the officer] confiscated and threw away."   *Id.* at 25-26.   Meraz also testified about an incident where officials refused to mail his envelope addressed to the Fayetteville courts because he had placed his documents in a large white envelope.   *Id.* at 26-27.   He was told it was an "unrecognized envelope" and his mail had to be in a "number 10 envelope."   *Id.* at 28.   The large envelope was placed in his property; however, after Meraz was contacted, the envelope was brought back, he was told to open the envelope, and it was taken away.   *Id.*

When Meraz was asked how Defendant Mulvaney violated his right of access to the courts, he indicated Defendant Mulvaney had: (1) given him the wrong addresses for subpoenas in his

---

1 References to "the policy," "the Sheriff's Office policy," or "the WCDC policies" are to the policies of Washington County.   *Brewington v. Keener*, 902 F.3d 796, 800 (8th Cir. 2018) (Official capacity claims "must be treated as a suit against the County").

criminal case (ECF No. 93-6 at 29); (2) attempted to prevent him from using "the mark of frank"[2] which he defined as "[t]he mark of free postage" (*Id.* at 33); (3) enforced the envelope policy (*Id.* at 34); and (4), failed to provide an actual physical law library or adequate access to one on the kiosk or tablets (*Id.* at 35-39).   Between the WCDC tying his hands and the ADC tying his hands, Meraz testified that in July of 2023 he was forced to ask for another public defender be assigned for him.   *Id.* at 30-31.

Meraz testified Defendant Corley refused to take his legal mail because it was in an unauthorized envelope.   (ECF No. 93-6 at 42).   The mail contained his subpoenas.   *Id.*   Meraz also asked Defendant Stout to mail the envelope, who also refused to do so.   *Id.* at 47.   The envelope was confiscated and Meraz was forced to borrow No. 10 envelopes to get it mailed out. *Id.* at 42-46.

In support of his official capacity claim, Meraz testified it was the policy of the WCDC that inmates could only use No. 10 envelopes.   (ECF No. 93-6 at 47).   Meraz believes this unfairly limits the contents to only one ounce requiring the use of multiple envelopes and related postage.   *Id.* at 48.   Meraz maintains the lack of a physical law library, coupled with the severe restrictions on the availability and use of the law library on the kiosk or the tablets, violated his

---

[2] According to the United States Postal Service: "Franked mail (also referred to as Congressional Mail) is official mail sent without postage prepayment by member and members-elect of Congress (which includes the Vice-President of the United States) and other authorized officials." https://faq.usps.com/s/article/What-is-Official-Mail-Penalty-Mail  (visited April 8, 2025). Franked mail is identified by a "specific marking or the written or facsimile signature (or frank) of a member of Congress in the upper right corner or the envelope or label.   This may be followed by 'M.C.' standing for member of Congress or 'U.S.S.' standing for U.S. Senate."   *Id.*

constitutional rights.  *Id.* at 55-56.  Finally, Meraz believes the WCDC needed to recognize the mark of frank because indigent inmates needed to have this as an available means of getting their mail sent.  *Id.* at 51-53.

Meraz states the subpoenas were never served.  And as noted above, between the WCDC "tying his hands" and the ADC "tying his hands," Meraz was forced to ask for another public defender be assigned for him in July 2023.  (ECF No. 93-6 at 30-31).  His newly appointed public defender did not believe the subpoenas were appropriate.  *Id.* at 31-32.  Meraz testified Defendant Mulvaney stated that although Meraz was indigent, they would not put postage on the envelope because his documents were in an unauthorized envelope.  *Id.*  Meraz testified Defendant Mulvaney finally allowed him to use the mark of frank.  *Id.*

Meraz further objected to the policy of providing indigent inmates with only two envelopes per week.  (ECF No. 93-6 at 50).  Meraz indicated that borrowing envelopes is against the WCDC policy of "trafficking and trading."  *Id.*  He then testified this was not part of his claim. *Id.* at 53.

Meraz filed multiple requests, grievances, and appeals regarding this claim.  On September 8, 2022, Meraz complained the kiosk and the tablets had not been working correctly for the last several weeks.  (ECF No. 93-3 at 13).  On November 16, 2022, Meraz indicated his attorney dropped off materials for him and some pages went missing.  *Id.* at 30.  On February 21, 2023, Meraz indicated he had paperwork he needed photo copies of for court on Friday.  *Id.* at 47.  He was told the detention center did not make copies; instead, he should ask his attorney.  *Id.*  On February 28, 2023, Meraz indicated he was acting *pro se.  Id.* at 50.  On February 28, 2023,

7

Meraz advised that some exhibits and writing materials had been dropped off for him and asked that he receive them sooner rather than later.  *Id.* at 51.  Meraz was informed he would receive the materials the following morning.  *Id.*

On December 2, 2022, Meraz wrote that he had just asked the state court to allow him to represent himself.  (ECF No. 93-3 at 124).  He indicated he had previously represented himself in San Diego, California, and had been given access to a cell that had a computer that could be used to access Lexis Nexis, Word, a printer, paper, television, a free phone for local calls, and a collect phone for long distance calls.  *Id.*  Additionally, a paralegal was assigned by the court to help him find and digest case law, obtain forms, or motions and discovery.  *Id.*  He asked if he could get access to something similar there or if he could petition to have that access.  *Id.*  In response, Meraz was told that if he was representing himself, he would have to get with the court to set up access to the law library.  *Id.*

On December 14, 2022, Meraz stated he had been trying to get the court rules and procedures and asked if a copy could be obtained for him.  (ECF No. 93-3 at 131).  In response, he was told he would need to ask his attorney.  *Id.*

On January 5, 2023, Meraz grieved that Defendant Stout refused to take an envelope that Meraz had set on the red square for jail checks.  (ECF No. 93-3 at 85).  Defendant Stout indicated he would not take it because Meraz knew better than to put it there.  *Id.*  Meraz complained that Defendant Stout had a bad attitude and asked that he not be allowed to work in that pod anymore.  *Id.*  In response, Meraz was told someone would pick up his mail.  *Id.*

On January 20, 2023, Meraz wrote that he had an attorney visit the prior Saturday and the attorney had dropped off a large white envelope with legal mail written on it.  (ECF No. 93-3 at 89).  Meraz stated the envelope contained exhibits his attorney asked him to go through along with reports pertaining to his case.  *Id.*  He asked where the envelope went.  *Id.*  In response, Meraz was asked whether he had confirmed with his attorney that the envelope had been dropped off.  *Id.*  Meraz responded that his attorney had pulled him out on Saturday between 1:00 p.m. and 2:30 p.m.  *Id.*  The attorney stated he had confirmed with the officer that Meraz would be allowed to have everything in the envelope.  *Id.*  In response, Meraz was advised that the shift that was on that day was being e-mailed to find out more information.  *Id.*  On February 22, 2023, Meraz closed the grievance.  *Id.* at 90.

On February 14, 2023, Meraz advised Defendant Mulvaney that the judge had agreed to allow him to represent himself.  (ECF No. 93-3 at 136).  Meraz asked about "the procedures to have exhibits dropped off"; whether he would be given something to write with other than a 3" pencil with no sharpener; whether he could have a highlighter; and whether he would have access to a computer or would need to hand write all materials.  *Id.*  Defendant Mulvaney responded that just because the court approved Meraz's request to represent himself did not mean the rules of the jail "went out the window," and he would be "provided everything" he wanted.  *Id.* Defendant Mulvaney indicated he would get with the detention center's legal counsel and Captain Ake ("Ake") regarding the issue.  *Id.*  Meraz was advised that he might need a court order to be allowed some of the things he requested, particularly computer access.  *Id.*  If the court did grant Meraz computer access, Defendant Mulvaney said it would not be at the WCDC.  *Id.*

On February 15, 2023, Meraz asked Defendant Mulvaney if he could have some carbon paper and a better writing utensil until Defendant Mulvaney received an answer regarding his other requests from Ake.  (ECF No. 93-3 at 137).  Meraz indicated he would have to write out his motions in triplicate if he could not obtain some carbon paper.  *Id.*  Defendant Mulvaney responded that they did not use carbon paper and Meraz would have to make do with the writing utensil he had.  *Id.*  If Meraz needed another pencil or his pencil sharpened, he was advised to get with the floor officer.  *Id.*

On February 21, 2023, Meraz asked for copies for court.  (ECF No. 93-3 at 138).  Defendant Fuller responded that they did not make copies and Meraz would have to ask his attorney.  *Id.*  The next day, Meraz said he needed the copies for court on Friday and was a *pro se* inmate.  *Id.* at 139.  In a response on February 23, Meraz was told the issue had been addressed with Ake and he would decide if they could make copies for Meraz.  *Id.*

On February 27, 2023, Meraz said he had something he needed notarized and several papers copied before court the following day.  (ECF No. 93-3 at 141).  He asked if Ake had ever provided an answer about whether they would provide copies.  *Id.*  In response, he was told the notary was advised of his request and he would be called down in a timely manner.  *Id.*  Nothing was said about copies.  *Id.*

On February 28, 2023, Meraz asked Defendant Mulvaney for something showing his mail log between February 14 and February 17.  (ECF No. 93-3 at 143).  Meraz said he had outgoing legal mail to the circuit court during this time which had not yet been received.  *Id.*  Meraz said he had been handed his derriere in court that day because the court had not received his documents.

*Id.* Meraz requested a letter from Defendant Mulvaney saying that if the court ordered basic supplies and computer access, the WCDC would make the necessary allowances. *Id.* Defendant Mulvaney responded on March 1, stating that there had been two outgoing letters addressed to the court clerk on February 16; remarked he was not sure how Meraz would know the mail had not been received; and refused to write a letter for Meraz. *Id.* Defendant Mulvaney advised whatever basic supplies Meraz was requesting would "need to be ordered by a judgment by court order." *Id.* On March 2, Meraz responded that he knew the court has not received his mail because it contained a motion asking for a court order regarding the supplies he was seeking. *Id.* On March 3, Defendant Mulvaney explained they had no control over the mail once it left the facility. *Id.* at 144. He stated that Meraz still had not explained how he knew the mail was not received. *Id.* Defendant Mulvaney reemphasized Meraz would not be provided with certain items without a court order, and even then, it could become an issue at that facility. *Id.* Defendant Mulvaney, however, expressed a willingness to work through the issues as they arose. *Id.* On March 3, Meraz offered a more detailed explanation that at the hearing he was trying to get the motions ruled on, but the judge could find no record they had been received. *Id.* Meraz suggested that if the judge ordered items the facility was uncomfortable with, he could be farmed out to a nearby county or sent to the ADC. *Id.* Defendant Mulvaney declined Meraz's suggestions. *Id.* at 145.

On March 4, 2023, Meraz stated he had turned over an *in forma pauperis* certificate of account that he needed signed. (ECF No. 93-3 at 52). Defendant Mulvaney refused to fill out the document because it was hand written. *Id.* He told Meraz he should have received the

official printed form with his § 1983 packet he received from the courts.  *Id.*  Meraz responded

it was not for a § 1983 form, but he would relay Defendant Mulvaney's comments to the judge.

*Id.*  Defendant Mulvaney asked for what or for whom Meraz needed the document.  *Id.* at 53.

Defendant Mulvaney said there should be a printed form.  *Id.*  Meraz responded that since he was

a *pro se* inmate he had been having to handwrite everything for the circuit court.  *Id.*  After this

exchange, on March 9, Defendant Mulvaney completed the form.  *Id.* at 53.

On March 6, 2023, Meraz wrote that he had someone filing some motions with the court

clerk for him but realized something was wrong in one of the motions.  (ECF No. 93-3 at 55).

Meraz said he had used the last of his phone money trying to get a message to them.  *Id.*  He

asked if there was any way he could use the phone in booking to make a local call to his

misdemeanor attorney.  *Id.*  Defendant Mulvaney responded that was not allowed.  *Id.*

Defendant Mulvaney advised him to write his attorney a letter or if his attorney was a public

defender to use the kiosk to contact him.  *Id.*

On March 7, 2023, Meraz indicated he was having trouble getting the clerk's office to

answer the phone from the prepaid phone.  (ECF No. 93-3 at 149).  He said he needed to try to

make a correction to a motion.  *Id.*  Meraz indicated he had also been unable to get his city court

attorney on the phone.  *Id.*  Defendant Mulvaney responded that they were not required to let him

use the "phone in booking as a free call to do these things."  *Id.*  He suggested Meraz write letters.

*Id.*

On March 8, 2023, Meraz asked why he was having such a hard time getting his clothing

and orders dropped off.  (ECF No. 93-3 at 151).  He stated he had a motion and order drawn up

for the judge to sign so there would not be an issue, but no one "would bother to come and get them." *Id.* Meraz referred to the mail system as a black hole. *Id.* Defendant Mulvaney indicated he did not know what Meraz was asking for and requested he explain in detail what he wanted. *Id.* Meraz closed the request. *Id.*

On March 9, 2023, Meraz again grieved about Defendant Mulvaney refusing to complete the handwritten form, and he argued he was being denied access to the courts. (ECF No. 93-3 at 91. Further, Meraz stated Defendant Stout had "refused to take my legal mail because it was in a legal envelope." *Id.* Meraz stated he was unable to make copies and lacked adequate or sufficient writing utensils and supplies. *Id.* Defendant Mulvaney responded that he had completed the handwritten form, although he still believed there should be a printed form. *Id.* With respect to the rest, Defendant Mulvaney asked what Meraz was requesting. *Id.* On March 10, Meraz stated that Defendant Mulvaney had completed the form only after Meraz threatened to tell the judge. *Id.* With respect to Defendant Stout denying his legal mail on March 8, Meraz said if he had been up against a time constraint his case could have been jeopardized or his request denied. *Id.* On March 14, Defendant Mulvaney responded he had spoken to Defendant Stout who stated the piece of mail was in a rather large manila envelope, "like letter size." *Id.* at 92. Defendant Mulvaney stated: "We are not required to send any mail out for free, except indigent mail. Indigent mail shall also be normal size, a normal envelope. If you are not indigent the[n] we will not send your mail for free. In particular a large sized envelope. It is your responsibility to pay the extra postage on this as well, not ours."

13

On March 12, 2023, Meraz indicated he was called on the speaker and asked if he was trying to mail a letter to Charlene Meraz.  (ECF No. 93-3 at 95).   Meraz told the person "yes," but he then asked a floor officer to find out why the inquiry was made.   *Id.*   In response, Meraz was told the question had come from property.   *Id.*   Before the end of the shift, the floor officer brought Meraz his legal envelope and asked him to open it.   *Id.*   Meraz asked why.   He was told the superior officer had directed its return and the confiscation of the envelope.   *Id.*   Meraz initially refused, saying it was legal mail and already five days late.   *Id.*   The officer then said the envelope contained no postage.   Meraz told him "it was a legal envelope and it was marked with frank."   *Id.*   At the time Meraz mailed it, he said he had no money and no envelopes.   *Id.*   Meraz believed that if the post office honored the mark of the frank, then so should the jail.   *Id.*   On March 16, Meraz said he had been "made to open" the envelope and it was confiscated.   *Id.* Meraz then had to borrow three stamped envelopes and luckily all three made it to their destination.   *Id.*   Meraz asked that the envelope problem be solved.   *Id.*   Meraz indicated he had been "doing time for 34 years" and had always been allowed to make his own envelopes and use the mark of frank.   *Id.*   Meraz remarked that sadly this had been a "real envelope."   *Id.*   Meraz appealed and was advised that it would be investigated.

On March 14, 2023, Meraz complained that Defendant Stout had refused to take his legal mail because of its size; Defendant Corley also refused to take the envelope because of its size and it not containing postage although it had the mark of the frank; and Meraz stated that while it was addressed to his mother the contents were legal.   (ECF No. 93-3 at 154).   Meraz stated he was never offered the opportunity to place the mail in separate envelopes which he indicated he would

14

have been able to do since he had received some funds on Saturday. *Id.* Meraz asked to speak to the Sheriff. *Id.* Defendant Mulvaney replied that legal mail must be addressed to a verified legal source; Meraz was not currently indigent and therefore any mail he sent out would be at his own cost; they did not send free legal mail, whether the inmate was *pro se* or not; and Meraz would not be allowed to speak to the Sheriff because he had personnel in place to handle business within the detention center. *Id.* On March 15, Meraz stated the mark of frank does not distinguish between the size of the envelope. *Id.* Further, he states he was indigent the day he attempted to mail the envelope. *Id.* at 155. With respect to the law library, Meraz stated that with only 15 minutes on the tablet was hard to find anything when there were no guidelines. *Id.* Defendant Mulvaney responded that it did not make any difference if Meraz was indigent or not. *Id.* If the envelope was larger than those provided by the commissary, "we are not responsible for spending any more money for postage than the normal postage amount allotted to indigent detainees." *Id.* With respect to the tablets and law library issues, Defendant Mulvaney indicated they were there for Meraz's use, but they were not allowed to assist him in his legal matters. *Id.* Meraz indicated he had used the mark of frank in the past and it had never been rejected. *Id.* at 156. Further, he said the facility had even refused to recognize some envelopes sold by commissary, such as the ones provided with cards. *Id.* If the post office recognizes the mark of frank and it was a legally sealed piece of mail, Meraz said the facility should recognize it. *Id.* When questioned regarding the dimensions of the envelope, Meraz responded it was 12" x 15.5". *Id.* Defendant Mulvaney responded the issue of postage was going to be between Meraz and the post office. *Id.* If Meraz wished to mail it, Defendant Mulvaney said the facility would send it. *Id.*

15

On March 21, 2023, Meraz said that during a pod search an officer took his legal envelope that had been delivered with legal mail inside.   (ECF No. 93-3 at 62).   Meraz reported the officer said inmates were not given the envelopes the legal mail came in.   *Id.*   Meraz stated he had never had an envelope taken from him.   *Id.*   He admitted this envelope was a little different as it was plastic.   *Id.*   Meraz says he and other inmates use the envelopes to organize their legal papers. *Id.*   Meraz stated he was allowed to keep all his paper envelopes but the plastic one was taken. *Id.*   In response, Meraz was advised the officers were correct in taking the plastic envelope and that it was not the facility's practice to give the legal envelopes with the mail.   *Id.*   On March 23, Meraz complained he had been using the envelope to organize his papers; he stated he did not understand what the problem was.   *Id.* at 159.

On March 24, 2023, Meraz complained that his legal papers had been searched in booking, an envelope was missing, the papers were all gone through, and two pages out of a phone log were missing.   (ECF No. 93-3 at 64).   In response, Meraz was told the booking sergeant had been contacted and advised that none of the paperwork and nothing that legally belonged to Meraz was missing.   *Id.* at 98.

On March 29, 2023, Meraz grieved that he had asked an officer for his pencil to be sharpened because it was his only means to write motions and briefs.   (ECF No. 93-3 at 99). Instead, the officer reached into another inmate's property box and said we do not sharpen pencils we replace them.   *Id.*   Meraz refused to take a pencil from the other inmate's property.   *Id.*   The officer told Meraz it did not matter as the pencils were county issued.   *Id.*   Meraz asked him how he knew that when commissary sold the same pencils.   *Id.*   The officer responded he did not "give

16

a shit" and walked off.   *Id.*   In Meraz's opinion, he was being held back or crippled in some form or fashion at every turn.   *Id.*   On March 30, Defendant Mulvaney wrote that Meraz was released from custody before this issue could be addressed.   *Id.*

On May 12, 2023, a string of communications began between Meraz and Defendant Mulvaney under the legal services tab that lasted for several days.   (ECF No. 93-3 at 100). Meraz stated he was back in custody and was still proceeding *pro se*.   *Id.*   Meraz asserted the booking officers took his writing utensil and a photo exhibit and he needed them back.   *Id.*   He pointed out he had been given nothing to write with.   *Id.*   That same day, Meraz was advised he would be provided a pencil.   *Id.*   Meraz wrote Defendant Mulvaney that he had several orders that he may need, and he indicated he had tried to get the booking officers to put them in Defendant Mulvaney's box, but they would not do so.   *Id.* at 161.   Defendant Mulvaney asked what orders Meraz was talking about and how much paperwork.   *Id.*   Meraz responded on May 15.   *Id.* at 162.   He indicated they had taken 25 sheets of photocopied pictures that were part of his exhibit and motion for discovery.   *Id.*   Meraz stated they went through his legal documents outside his presence.   *Id.*   Meraz tried to provide Defendant Mulvaney with copies of the orders allowing him to proceed *pro se* and dress in free world clothes when he left the jail.   *Id.*   Meraz asked that Defendant Mulvaney have his exhibit returned to him.   *Id.*   Finally, Meraz asked that the officers search his legal materials in front of him and only remove staples, not his exhibits.   *Id.*   On May 16, Defendant Mulvaney indicated he would investigate the issue more.   He said he was not aware the WCDC had been ordered to do or allow anything; he asked what court the orders came from. *Id.*

Meraz responded stating there were three orders: (1) granting him *pro se* status; (2) appointing him stand-by counsel; and (3) allowing him to dress in free world clothes whenever he left the jail. *Id.* at 163. Meraz added his assistant would be dropping off his clothes the following day. *Id.* When he arrived back at the WCDC from the ADC, Meraz stated booking searched all his legal work outside his presence and removed his photo exhibit. *Id.* Meraz indicates he was told nothing had been taken, but the photo exhibit was missing. *Id.* Meraz indicated the photo-exhibit was part of his discovery and he needed it back. *Id.* Moreover, Meraz said papers had also gone missing when Officer Jordan searched his documents. *Id.* Jordan admitted taking the envelope but stated he could no longer find it. *Id.*

Defendant Mulvaney again asked what court had issued the orders. (ECF No. 163). Meraz answered "out of [J]udge [T]aylor['s] court room Fayetteville department." *Id.* On May 18, Defendant Mulvaney acknowledged receipt of the copies of the orders clarifying that Meraz was allowed to wear free world clothing only to court appearances. *Id.* at 164. Defendant Mulvaney indicated staff were allowed to search anything including legal documents, but they were not to read the paperwork. *Id.* Defendant Mulvaney denied understanding what Meraz meant by asking that his stuff be searched in front of him. *Id.* Defendant Mulvaney closed by asking if Meraz had received "any of this paperwork yet pertaining to your case?" *Id.* With respect to the incident in March, Meraz stated Jordan had search his legal paperwork while he was dressing out. *Id.* at 165. Meraz discovered his legal envelope was missing, his legal documents were out of order, and two pages of a phone log were gone. *Id.* Meraz indicated he filed a grievance and was told nothing had been taken. *Id.* Meraz states he was then transported to the

18

ADC.  When he came back to the WCDC for court, Meraz indicated his documents were searched. *Id.*  A package order form, catalogue, and a 25-page photo exhibit in his motion for discovery had been taken.  *Id.*  Meraz indicated this exhibit had been in his possession for at least three months before he left for the ADC.  *Id.*  Meraz asked for his photo exhibit to be returned to his possession before something happened to it.  *Id.* at 165.  If Defendant Mulvaney had the papers missing from March, Meraz asked that he also be provided with those.  *Id.*

On May 24, 2023, Defendant Mulvaney responded that he investigated the incident with Deputy Jordan on March 23; that on the video footage it appeared the item taken was a plastic bag not an envelope; and Defendant Mulvaney said nothing was taken that would be part of Meraz's case file.  (ECF No. 93-3 at 169).

Meraz stated he had no issue with his belongings being searched but believed he should be allowed to have his entire case file including the photo exhibit in his possession.  (ECF No. 93-3 at 170).  Defendant Mulvaney indicated Meraz would be allowed to view the exhibit and make notes.  *Id.*  Defendant Mulvaney pointed out that inmates are not allowed to have photos.  *Id.* Further, he remarked that keeping the exhibit in Meraz' property would keep the material safe. *Id.*  This is the end of the chain of communication on these issues.

On May 25, 2023, Meraz submitted a grievance maintaining the kiosk was not adequate for the law library.  (ECF No. 93-3 at 107).  He pointed out that there was no table to write on and chair to sit on while you were searching and no one to help you figure out how to maneuver around on the app.  *Id.*  Additionally, he pointed out there was not enough time in the day for everyone in the pod to have use of the kiosk for 30 minutes a day.  *Id.*  Meraz also complained

19

you had to pay $.99 to be able to use the law library on a tablet.   *Id.*   Further, he stated the kiosk did not support the amount of video visits that were being made, resulting in everyone having to get off the kiosk so another inmate could have his visit.   *Id.*   In response to this grievance, Meraz was told to make a request for legal through the legal tab.   *Id.*

That same day, Meraz submitted a legal services request to obtain copies of the subpoenas that were in the large envelope.   (ECF No. 93-3 at 171).   With respect to a subpoena asking for copies off his grievances, Meraz asked if he addressed it to the jail or to tech friends.   *Id.* Defendant Mulvaney responded that they did not make copies.   *Id.*   He also stated that they could not give legal advice.   *Id.*

## B.    The Record Related to the Classification Claim

According to Defendant Mulvaney, the Sheriff is charged with developing and implementing an objective classification plan.   (ECF No. 93-1 at 2).   "When possible, sex-related offenders shall be separated immediately to protect the health and safety of that detainee and of other detainees."   *Id.*   Defendant Mulvaney further states:

> Detainees shall be classified and housed in the least restrictive housing available without jeopardizing staff, detainees or the public, utilizing the following risk factors:
>
> (A) current offense or conviction;
> (B) offense history;
> (C) escape history;
> (D) institutional disciplinary history;
> (E) prior convictions;
> (F) alcohol and/or drug abuse; and
> (G) stability factors.

*Id.*; *see also* ECF No. 93-4 at 2 (WCDC classification policy).

WCDC policy D3.00 deals with classification.  (ECF No. 93-4 at 1).  Certain inmates are to be separated by sight and to the greatest extent possible including female and male inmates, juveniles, and witnesses and civil inmates.  *Id.*  Other categories of inmates are to be physically separated, including those with special problems such as addicts, handicapped persons, persons with communicable diseases, inmates requiring administrative segregation, pretrial detainees and post-trial detainees, and misdemeanants and felons.  *Id.*  Section 16-1015, of the classification policy is entitled inmate separation and provides as follows:

> The facility shall be designed and constructed so those inmates can be separated according to existing laws and regulations, or according to the facility's classification plan.  The facility shall have a sufficient number of cell blocks or clusters of detention room[s] in an appropriate configuration so that the various categories of inmates can be housed separately.

*Id.*

In the definition section, the classification policy provides: "Sex Related Offenders: When possible, this type of offender shall be separated immediately to protect the health and safety of that inmate and of other detainees."  (ECF No. 93-4 at 1).

According to the policy, every detainee is to be "classified upon admission to the facility, and shall be assigned housing according to the classification."  (ECF No. 93-4 at 2).  The procedures include:

(1) An intake screening for purposes of identifying any medical, mental health, or other special needs that require placement in a special housing unit;

21

(2) An initial custody assessment to be completed on "newly admitted detainees prior to permanent housing assignments to determine custody levels."   This is to be completed within 48 hours of booking, excluding weekends and holidays; and

(3) Custody reassessments which are to be "conducted within 30 days of the Initial Custody Assessment and immediately upon any disciplinary action and/or change in legal status."   From this point, reassessments are done every 90-days for those in minimum classifications, and every 30-days for those in medium and maximum classifications.   *Id.* at 3.

The initial custody classification is based on a numerical assessment score arrived at by consideration of seven risk factors.   (ECF No. 93-4 at 4).   As noted above, the seven risk factors are: severity of current offense/conviction; serious offense history; escape history; institutional disciplinary history; prior felony convictions; alcohol and/or drug abuse, and stability factors.   *Id.* at 5.   The classification level determined is to be documented.   *Id.*   Supervisory personnel assign the final custody level.   *Id.* at 7.   Reassessments are based on the same seven risk factors and the resulting score is determined.   *Id.*   The recommended housing assignment is to be indicated.   *Id.* at 10.

Defendant Mulvaney states there is a "documented appeals process for classification assessments, housing, work and program assignments and reassessments."   (ECF No. 93-1 at 3; *see also* ECF No. 93-4 at 3, WCDC Classification Policy).   With respect to classifications, the reassessment includes reviewing all objective criteria utilized during the initial assessment and "any new information that may be available either due to the period of time that has elapsed since

the last classification or by an incident or status change triggering the review."[3]   *Id.*   The policy recommends that classifications be conducted "with face-to-face interviews."   (ECF No. 93-4 at 4).   The interviews average 15 minutes.   *Id.*

With respect to his placement in the sex offender pod, Meraz testified he is not a sex offender and should not have been labelled one.   (ECF No. 93-6 at 56-57).   Meraz stated that as far as he knew, the WCDC policy was that if you were ever arrested for a sex crime you are a sex offender whether you are convicted or not.   *Id.* at 57.   Meraz indicated he had been accused of rape in 2007 but had not been convicted.   *Id.* at 58.   Meraz testified he was jumped in his sleep at the ADC by two inmates because they read, he had been housed in a sex offender pod and had been charged with rape.[4]   *Id.* at 58, 73.   Additionally, Meraz stated several inmates he had been housed with at WCDC ended up in the ADC with him.   *Id.* at 60.   As a result of the attack, Meraz testified he no longer sleeps well.   *Id.* at 73.

Other than what is in his Amended Complaint, Meraz could not recall what Defendants Fuller, Nunziato, Velasco, or Drumwright did regarding the classification claim.   (ECF No. 93-6 at 64).   Meraz did recall Defendant Drumwright responded to one of Meraz's grievances by saying he was housed correctly.   *Id.* at 66.   Then during a jail check, Meraz testified Officer

---

[3] The record does not contain any documents regarding Meraz's initial assessment, any reassessments that occurred, or the results of any appeals.

[4] Specifically, Meraz testified that if you Googled his name on a tablet, the ruling on the summary judgment motion on exhaustion came up.   (ECF No. 93-6 at 59).   In the ADC, sex offenders are not separately housed.   *Id.* at 71.   A video of the attack was obtained by subpoena at Meraz's request.   (ECF No. 76 and staff notes dated August 6, 2024).   The video is on file with the Fayetteville Clerk's Office.

Martinez stated Meraz had been in the sex offender pod for so long that if he were moved out, his life would be in danger. *Id.* at 67-68.

In his Amended Complaint, Meraz alleges that on August 17, 2022, Defendant Corley told him he was properly classified despite Meraz's protestations that he had never been convicted of a sex crime. (ECF No. 10 at 9). Meraz says Defendant Velasco advised him that the records showed Meraz had been convicted of rape. *Id.* Meraz alleges Defendants Fuller and Nunziato made similar statements and refused to move him. *Id.* at 10. On February 11, 2023, Defendant Drumwright asked Meraz how he was being punished; Meraz responded that he had not been convicted of the rape charge. *Id.* Defendant Drumwright replied that Meraz had been in the sex offender pod for so long that all the trustees had seen him. *Id.* If Meraz was moved to general population, Defendant Drumwright believed Meraz's life would be in danger. *Id.* Meraz alleged he paid for a certified copy of his 2008 commitment papers and mailed them to Captain Ake. *Id.*

Meraz submitted multiple requests and grievances questioning his assignment to the sex offender pod. (*See e.g.,* ECF No. 93-3 at 9, 40, 42-43, 86). He stated he had never been convicted of a crime that would qualify him as a sex offender. *Id.* at 40. Meraz indicated he had appealed his placement, but he was never told anything and was just left in with the sex offenders. *Id.* He asked why the classification decision had been made and was told it was based on his current charges and his past history. *Id.* Meraz continued to protest his housing status asserting that he had never been required to register as a sex offender. *Id.* at 42. This time, Meraz was advised that reviewing his past charges indicated a charge out of Berryville in 2007 justified his being housed in the sex offender pod. *Id.* Meraz protested that he was not convicted of the rape

24

charge.  *Id.* at 43.   Meraz asserted he was being punished based on an old arrest and charge that did not result in a conviction.  *Id.*   An officer replied that the information he had access to indicated Meraz was found guilty of rape in 2008.  *Id.* at 43-44.

On February 13, 2023, Meraz again asserted his innocence on the rape charge, stated he had only been convicted of kidnapping, and at sentencing the judge specifically told him that he would not be a sex offender.  (ECF No. 93-3 at 86).   Defendant Fuller responded that with Meraz's past and present charges he had been classified correctly.  *Id.*   On February 14, Meraz wrote that any records showing he had been convicted of rape were inaccurate.  *Id*. at 88.   He indicates he was then told that because he had been in the sex offender pod for so long it would be dangerous to place him back in general population because all the trustees had seen him and would inform general population of his sex offender status.  *Id.*

Meraz continued to protest his housing classification and reasserted that he had never been convicted of the rape charge.  (ECF No. 93-3 at 93).   On March 9, 2023, Meraz grieved that he had been advised it would not be safe to remove him from the sex offender pod.  *Id.*   Defendant Mulvaney responded that he was looking into this issue.  *Id.*   On March 15, 2023, Defendant Mulvaney indicated this was the first time he had responded to a grievance regarding Meraz's housing assignment.  *Id.*   Moreover, Defendant Mulvaney said "it may not necessarily mean anything that you were not found guilty or anything.   It may just be the charge itself regarding your housing."  *Id.* at 94.

### C.    The Record Related to the Grooming Policy Claim

With respect to the grooming policies, Defendant Mulvaney indicates that haircuts are available to detainees prior to their court dates.  (ECF No. 93-1 at 3).  Additionally, "[s]having is available to detainees on the day of his/her court appearance or at the direction of the on duty supervisor."  *Id.*; *see also* ECF No. 93-4 at 13 (grooming policy).

Meraz testified the WCDC policy on grooming with respect to haircuts is "either all or nothing, meaning you either get it all buzzed off to a—I believe it is a number two, or you get nothing cut at all.  Same with the facial hair."  (ECF No. 93-6 at 74).  Shaves and haircuts were only available about every three months.  *Id.*  As a result, Meraz stated he had to let his goatee grow out and eventually stopped cutting his hair.  *Id.*  While he was detained in Carroll County, Meraz noted that inmates were allowed to cut their hair however they wanted.  *Id.* at 75.  Meraz believed the policy at the WCDC was really a "mental game to get you to cop out a plea so they could get a conviction and get you down the road."  *Id.* at 76.

While Meraz originally asserted that as a Native American the grooming policy violated his religious rights, during his deposition he testified that it was not so much the Native American religion but "our way of life."  (ECF No. 93-6 at 76-77).  He indicated Native Americans wore their hair in numerous different styles and he was not "allowed to wear my hair that way."  *Id.*

On October 9, 2022, Meraz wrote he had been trying to get a shave since August 13, 2022.  (ECF No. 93-3 at 76).  He complained he felt dirty, grungy, and worthless because of his inability to shave.  *Id.*  In response, he was told courtesy shaves are not required.  *Id.*  If an officer was available, he could decide to provide a courtesy shave.  *Id.*  Meraz was advised to keeping

26

checking with an officer for availability.   *Id.*   When Meraz asked for the clippers because he had court on November 8, 2022, he was advised his court date was reset to February 28, 2023.   *Id*. at 29.

On November 7, 2022, Meraz stated when inmates requested a haircut and a shave for court they were asked if it was by Zoom.   (ECF No. 93-3 at 123).   Meraz indicated it was his belief that having court via Zoom was the same thing as being physically in a courtroom.   *Id.*   In response, Meraz was told they only provided shaves and haircuts for in-person trials.   *Id.*   "All other court appearances (i.e., 8.1 Hearings and Arraignments), including Zoom, do not qualify."   *Id.*

On February 26, 2023, Meraz wrote that he had court on February 28, and as he was acting *pro se* he had requested to be present at all hearings.   (ECF No. 93-3 at 140).   He asked to be allowed to use a razor.   *Id.*   In response, Meraz was told court shaves were provided for "all felony trials.   If you are to be present in court, we will offer a court shave."   *Id.*

On May 16, 2023, Meraz stated he had court in the morning and would like to shave.   (ECF No. 93-3 at 173).   In response he was told if he was eligible for a shave, he would be offered one. *Id.*

On May 25, 2023, Meraz submitted a grievance complaining that the hair cut policy was not sufficient to meet his religious beliefs or for his mental state while he was going through the trauma of being accused of a crime.   (ECF No. 93-3 at 108).   In response, Defendant Mulvaney asked what Meraz's issue was other than believing the policy was wrong.   *Id.*   Additionally, Defendant Mulvaney stated it was not a written policy merely a verbal standing order that had

been in place for many years.   *Id.*   Meraz indicated he objected to the policy's "all or nothing" requirement.   *Id.*   According to Meraz, they were required to cut their hair to "either a #2 eve[r]y where or a 0 ev[er]y where we can't do fads or a high and tight a feath[er]ed or a mullet."   *Id.* Meraz stated a shave was also "all or nothing."   *Id.*   Meraz remarked that "verbal or not" it was the detention center's policy.   *Id.*   Meraz appealed and was told: "I understand you would like more options for hair cuts and shaves, but that is not something we are able to do at the jail.   The hair cuts and shaves are not mandatory they are a courtesy."   *Id.*

## II.   APPLICABLE STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."   *Nat. Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."   *Matsushita*, 475 U.S. at 586.   "They must show there is sufficient evidence to support a jury verdict in their favor."   *Nat.l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).   "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment."   *Id.* (citing *Metge v. Baehler*, 762 F.2d

621, 625 (8th Cir. 1985)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.    DISCUSSION

Defendants have moved for summary judgment on the following grounds.  First, they contend their policies did not infringe on Meraz's access to the courts.  They maintain Meraz cannot establish any actual injury - which is essential to prevail on an access to the courts' claim.  Second, they maintain their sex offender housing policy does not violate the constitution.   Third, they maintain their grooming policy does not violate the constitution.   Finally, Defendants argue they are entitled to qualified immunity.

### A.    The Access to the Courts Claim

The Supreme Court has held "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."  *Lewis v. Casey*, 518 U.S. 343, 346 (1996) (quoting *Bounds v. Smith*, 430 U.S. 817 (1977).  Nevertheless, the Supreme Court "did not create an abstract, freestanding right to a law library or legal assistance."  *Lewis*, 518 U.S. at 351.  Instead, prison officials must provide "some means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts."  *Bear v. Fayram*, 650 F.3d 1120, 1123 (8th Cir. 2011) (internal quotations and citations omitted).  These means may include, but are not limited

29

to: prison libraries; jailhouse lawyers; private lawyers on contract with the prison; or some combination of these and other methods. *Id.*

An inmate cannot prevail on an access-to-courts claim unless he can demonstrate he suffered prejudice or actual injury because of the prison officials' conduct. *See Lewis*, 518 U.S. at 351-2; *see also Farver v. Vilches*, 155 F.3d 978, 979-80 (8th Cir. 1998) (per curiam). "To prove a violation of the right of meaningful access to the courts, a prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim.'" *Hartsfield v. Nichols*, 511 F.3d 826, 831 (8th Cir. 2008) (internal quotation and citations omitted).

The Court is not unsympathetic to the increased difficulties faced by inmates who are acting *pro se*. As Meraz describes, it is extremely difficult to research legal matters when one kiosk is shared by all inmates in the pod, there is no table or other surface to write on, and inmate visits occur via the kiosk. The Court finds credible Meraz's testimony about the difficulties obtaining access to the tablets for the free three 15-minute increments of tablet time when the increments must be three hours apart. Clearly, this makes the tablets a less-than-optimal method of conducting legal research. Similarly, having writing utensils limited to 3-inch golf pencils with no sharpeners available and having to mail everything in a No. 10 envelopes further exacerbates the situation. While these limitations are significant, Meraz can show no actual injury. His documents were mailed, albeit with some delay when he used either an "unrecognized envelope" or the mark of frank; his subpoenas were issued by the Court and ultimately determined to be

30

unnecessary when he was again appointed counsel; although it was somewhat sporadic, he did have access to a law library; while his access was at times delayed, Meraz had access to writing materials, envelopes, and postage; he was able to represent himself in his criminal case for more than a year; and he was able to file this civil case.   Meraz simply cannot prove an "actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim." *Hartsfield*, 511 F.3d at 831 (citation and internal quotation marks omitted).

The absence of an actual injury is fatal to Meraz's access to courts claim.   It is, therefore, unnecessary to separately address his individual capacity claims against Defendants Mulvaney, Corley, and Stout, his official capacity claim against Washington County, or qualified immunity. *See e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity); *Schoelch v. Mitchell*, 625 F.3d 1041, 1048 (8th Cir. 2010) (holding that there was no need to consider claim against the city when there was no evidence that any of the individual officers committed a constitutional violation).

The Defendants are entitled to summary judgment on this claim.

### B.    The Classification Claim

Meraz was confined in the WCDC due to pending criminal charges.   Thus, even though he had been convicted on other charges, he is entitled to be treated as a pretrial detainee.[5]

---

[5] If treated as a convicted inmate, Meraz would have to show an atypical and significant hardship for a classification system to implicate liberty interests.   *Sandin v. Conner*, 515 U.S. 472 (1995).

It is well settled that a pre-trial detainee may not be punished without first providing him due process. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Pretrial detainees are presumed innocent and cannot be punished for the crime for which they have been charged. *Bell v. Wolfish*, 441 U.S. 520, 535-37 (1979). Pretrial conditions are punishment if they are "intentionally punitive." *Stearns v. Inmate Servs. Corp.*, 957 F.3d 902, 907 (8th Cir. 2020). Additionally, pretrial conditions are punishment if they are "not reasonably related to a legitimate governmental purpose or were excessive in relation to that purpose." *Id.*

"[T]he effective management of the detention facility once the individual is confined is a valid objective that may justify the imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment." *Bell*, 441 U.S. at 540. Conditions or restrictions that are "reasonably related to a legitimate governmental objective," such as institutional order and security, do not amount to punishment. *Id.* at 539-40; *see also Brown-El v. Delo*, 969 F.2d 644, 647 (8th Cir. 1992) ("We do not quarrel with the prison's need to segregate individual inmates from the general prison population for non-punitive reasons; for example ... where there is a threat to the safety and security of the institution"). If the conditions or restrictions are deemed punishment, the pretrial detainee is entitled to due process.

Here, Meraz maintains he was wrongfully classified as a sex offender. He admits he was charged with rape in 2007 but states he was not convicted.[6] As such, he does not believe the

---

[6] Meraz does not indicate he was acquitted—only that he was not convicted, suggesting he may have entered into a plea agreement regarding his charges. This suggestion is buttressed by Meraz's statements that he was convicted of kidnapping which arose out of the same offense as the charge of rape. This, however, is not of import to the decision of the Court.

charge of rape should be taken into consideration in his classification. Meraz agrees that the separation of sex offenders is for the purpose of protecting those inmates from possible harm by inmates in the general population. He points to no restrictions on his access to the kiosk and tablets, visitation, commissary, recreation, programs, or lack of privileges he has suffered because of being housed in the sex offender pod. The only restriction Meraz mentions is that he was ineligible to serve as a trustee.

The decision to place Meraz in the sex offender pod was not a disciplinary matter, or punishment for crimes he was being charged with, but rather it was based on an administrative classification system, designed to protect the safety of all inmates and preserve order in the prison. Detention facilities have legitimate interests in segregating individual inmates from general population for non-punitive reasons, such as where there is a threat to the safety of the inmates or order in prison. *Hewitt v. Helms*, 459 U.S. 460, 468 (1983); *see also, Wood v. Sweet*, No. 4:22-cv-00496, 2022 WL 22210242 (E.D. Ark. Aug. 2, 2022) (pretrial detainee's placement in the sex offender pod did not amount to punishment); *cf. Vega v. Lantz*, 596 F.3d 77, 83 (2nd Cir. 2010) (Vega did not have a liberty interest in not being assigned the SOTN score he received based on acquitted conduct); *Wilks v. Mundt*, 25 F. Appx 492 (8th Cir. 2002) (prisoner's classification as sex offender, "without more," does not constitute an atypical and significant hardship).

The Court agrees with Defendants that Meraz's claims for declaratory and injunctive relief are moot because of his transfer to the ADC. *See e.g., Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) (inmate's claim for declaratory and injunctive relief are moot when he was transferred to another facility). While Meraz seeks monetary damages based on the injuries he

33

suffered at the ADC (*see* ECF No. 93-6 at 70), the WCDC Defendants had no obligation to protect him from future inmate attacks occurring at another facility - nor could they have.  *See e.g., DeShaney v. Winnebago Cty. Dep't. of Soc. Servs.*, 489 U.S. 189, 195-96 (1989) (the State had no duty under the Due Process Clause to protect individuals from harm by private actors).

There is simply no evidence in the summary judgment record from which the inference can be drawn that Meraz's placement in the sex offender pod was the result of an intent to punish him, or that it was not reasonably related to a legitimate governmental purpose, or that it was excessive in relation to that purpose.   In short, there was nothing improper or unconstitutional about WCDC officials considering Meraz's criminal history when calculating his classification.   He was afforded the right to appeal the classification, even though his appeal did not result in his reclassification.

Defendants are entitled to summary judgment on this claim.

## C.    The Grooming Policy

"[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977) (citation and quotation marks omitted).   "[I]ssues of prison management are, both by reason of separation of powers and highly practical considerations of judicial competence, peculiarly ill-suited to judicial resolution, and ... accordingly, courts should be loath to substitute their judgment for that of prison officials and administrators."  *Hamilton v. Schriro*, 74 F.3d 1545, 1550 (8th Cir. 1996) (quotation marks and citations omitted).

In his deposition, Meraz clarified he was not really claiming the grooming policy violated his religious rights as a Native American[7]; rather, his objection was that the policy did not allow him to continue his way of life.   (ECF No. 93-6 at 76-77).   He noted that Native American's wore their hair in different ways, and the WCDC policy did not allow him to do that.   *Id.* at 76.   Meraz gave examples of a Mohawk or a long braid in the back.   *Id.*   Overall, Meraz described the grooming policy as "fucking with my psyche, I couldn't cut my hair the way I liked to," and in his view, "[t]hey're trying to do all this shit to try and get us to cop out a plea."   *Id*. at 78-79.   Meraz presents no argument that he was treated differently than other inmates in the WCDC.

Nothing in the summary judgment record suggests the WCDC's grooming policy or practice is intentionally punitive.   Rather, Meraz contends the WCDC, like other detention facilities he has been incarcerated in, could easily make clippers and razors available and allow the inmates to groom in the manner they desired.   He does not deny he was offered opportunities to shave and cut his hair.   He does not suggest he was harmed in anyway.   In fact, he decided it was better to allow his beard to grow rather than suffer from itching the shaving caused.   (ECF No. 93-6 at 75).   Meraz testified that Native Americans grew their hair so they could cut it off to place with a loved one to take them to the afterlife.   *Id.*   Meraz admits he was not prevented from growing his hair.   Instead, Meraz asserts he did not like the way the policy affected his psyche because he could not cut his hair the way he wanted.   *Id.* at 78.

---

[7] *See Hamilton v. Schriro*, 74 F.3d 1545 (8th Cir. 1996) (Native American's religious rights not violated by facility's enforcement of a hair length regulation).

While the Court agrees the "all or nothing" nature of the WCDC grooming policy did not leave inmates with many options, and it would be possible for the WCDC to alter the policy in the manner Meraz suggests, there is simply nothing in the summary judgment record from which it can be inferred the grooming policy was punitive in nature rather than a decision based on the needs of the facility, including the availability of personnel. Other than a possible religious rights claim, which we do not have here, the Court knows of no constitutional right for an incarcerated individual to groom in his desired manner. Furthermore, to the extent Meraz requests declaratory or injunctive relief, his claims were mooted by his transfer to the ADC.

As no constitutional violation occurred, the Court need not address qualified immunity or official capacity liability. The Defendants are, therefore, entitled to summary judgment on this claim.

## IV.    CONCLUSION

For the reasons and upon the authorities discussed above, it is RECOMMENDED that the Defendants' Motion for Summary Judgment (ECF No. 91) be **GRANTED**, and that this case be **DISMISSED WITH PREJUDICE.**

**Status of Referral: The referral terminates upon the filing of this Report and Recommendation.**

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties**

**are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 9th day of April 2025.

/s/  *Mark E. Ford*
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

37